Matter of Blamah v New York Off. of the State Comptroller (2022 NY Slip Op 04594)

Matter of Blamah v New York Off. of the State Comptroller

2022 NY Slip Op 04594

Decided on July 14, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 14, 2022

532394
[*1]In the Matter of Tenneh Blamah, Petitioner,
v
New York Office of the State Comptroller, Respondent.

Calendar Date:May 24, 2022

Before:Lynch, J.P., Clark, Pritzker, Ceresia and McShan, JJ.

Stewart Law Firm PLLC, Rosedale (Nadira S. Stewart of counsel), for petitioner.
Letitia James, Attorney General, Albany (Beezly J. Kiernan of counsel), for respondent.

Lynch, J.P.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondent terminating petitioner's employment.
For nearly 15 years, petitioner was respondent's chief examiner within the Division of Local Government for the Newburgh Regional Office. In that capacity, she was responsible for, among other things, developing a plan for the audits the office undertook of local entities and making audit assignments. By letters dated February 26, 2019 and March 6, 2019, petitioner was informed pursuant to Civil Service Law § 75 that respondent had received information implicating her as a potential subject for discipline, without specifying the subject of the inquiry. After submitting to interviews regarding the allegations, petitioner was served with two notices of discipline formally charging her with various acts of misconduct during an audit of the Croton-on-Hudson Volunteer Fire Department (hereinafter the Croton-on-Hudson audit) and an audit of the Lakeland Central School District (hereinafter the Lakeland audit). Petitioner denied the charges. Following a disciplinary hearing, a Hearing Officer concluded that certain specifications in the charge documents were unsupported, but ultimately recommended that petitioner be found guilty of the charges and terminated from employment. Respondent adopted the Hearing Officer's recommendations and terminated petitioner's employment, effective December 31, 2019. Petitioner commenced this CPLR article 78 proceeding seeking to annul respondent's determination and be reinstated to her position. Following joinder of issue, the proceeding was transferred to this Court (see CPLR 7804 [g]).
Contrary to petitioner's contention, the misconduct findings are supported by substantial evidence. "Pursuant to Civil Service Law § 75 (1), a civil service employee 'shall not be removed or otherwise subjected to any disciplinary penalty . . . except for incompetency or misconduct shown after a hearing upon stated charges'" (Matter of Scuderi-Hunter v County of Delaware, 202 AD3d 1309, 1314 [2022]; accord Matter of Kiyonaga v New York State Justice Ctr. for the Protection of People with Special Needs, 204 AD3d 1351, 1353 [2022]). "The standard of review of such a determination made after a disciplinary hearing is whether it is supported by substantial evidence" (Matter of Scuderi-Hunter v County of Delaware, 202 AD3d at 1314 [citations omitted]) — "a minimal standard that requires less than [a] preponderance of the evidence and demands only the existence of a rational basis in the record as a whole to support the findings upon which the determination is based" (Matter of Wales v City of Saratoga Springs, 200 AD3d 1262, 1264 [2021] [internal quotation marks and citations omitted]).
For the Croton-on-Hudson audit, the charge document alleged that petitioner: (1) was insubordinate when she ignored an order from a superior to cease [*2]work on the audit after learning that the treasurer of the Croton-on-Hudson Fire Department (hereinafter the Fire Department) had committed a fraud, at which point respondent's Division of Investigations (hereinafter DOI) assumed responsibility over the investigation; (2) violated respondent's internal fraud protocols by directing a subordinate to contact the Croton-on-Hudson Police Department (hereinafter the Police Department) to obtain information about the fraud notwithstanding that DOI was exclusively tasked with that responsibility; (3) lied about her conduct during the investigation into the matter; and (4) acted unethically and failed to adhere to the Local Government and School Accountability's Comprehensive Audit Manual (hereinafter the Comprehensive Audit Manual).
The hearing evidence established that petitioner's office became aware of a significant disparity between the amount of state funds received by the Fire Department and the funds ultimately distributed to local fire units. Nevertheless, the draft audit report did not identify any fraud in this respect. Before the final audit report was issued, evidence surfaced that the Fire Department's treasurer may have stolen approximately $300,000 in funds distributed from the State. Gabriel Deyo — petitioner's supervisor — testified that he first learned about the alleged fraud within the Fire Department on March 17, 2018, through an email from Andy SanFilippo, the Executive Deputy Comptroller. SanFilippo directed Deyo to cease all work on the Croton-on-Hudson audit, as DOI was, under respondent's internal fraud protocols, responsible for coordinating "[a]ll contacts with law enforcement."[FN1] Deyo, in turn, testified that he called petitioner on or around March 19, 2018 and told her to "take no further action."
Despite that order, there was evidence that petitioner knew that DOI had taken over the investigation and yet continued to take further action on the audit. To that end, Thomas Casaregola, DOI's chief of forensic audits, revealed that he advised petitioner on March 20, 2018 that law enforcement had reached out to his office about an alleged fraud within the Fire Department and informed her that "we [a]re going to be working on the case." He maintained that it was clear from their conversation that DOI was now involved. Another auditor who was present for this conversation corroborated Casaregola's testimony to this effect. After a March 22, 2018 meeting with petitioner and other individuals involved with the audit, Casaregola learned that petitioner had directed Ellen Kennedy — one of her subordinates — to contact members of the Police Department regarding the matter. Kennedy herself corroborated this assertion, testifying that, on March 21, 2018, petitioner directed her to "contact someone in the Village to find out who the individual was that had" engaged in the fraud, and sent her an email stating that "the assistant chief may know" and to "please call the chief." Casaregola [*3]indicated that petitioner's actions in this respect could have compromised DOI's investigation and threatened respondent's reputation by making it appear as if it did not have a cohesive unit tasked with investigating the matter.
During her March 5, 2019 interview regarding the allegations, petitioner denied having been told by Deyo on March 19, 2018 to cease work on the Croton-on-Hudson audit. She also denied having been informed by Casaregola the next day that DOI was involved in the matter, emphasizing that, although they engaged in a conversation about an issue with the audit, she did not interpret his statements to mean that DOI had taken over. As for the allegation that petitioner directed Kennedy to reach out to the Police Department, her answers during the interview were somewhat evasive. She acknowledged directing Kennedy to contact the "council members" for information about the alleged fraud but not the Police Department.
Deferring to the Hearing Officer's credibility determinations, we conclude that there is substantial evidence in the record to sustain the misconduct findings as they pertain to the Croton-on-Hudson audit. The allegation under charge No. 1 that petitioner engaged in insubordination was supported by the testimony that she violated Deyo's order — given on or around March 19, 2018 — to stop all work on the Croton-on-Hudson audit by thereafter directing Kennedy to contact village officials and the chief of police regarding the alleged fraud within the Fire Department (see Matter of Gaffney v Addison, 132 AD3d 1360, 1360 [2015]; Matter of Foster v Saratoga Springs City School Dist., 16 AD3d 824, 825 [2005]). This same evidence, along with Casaregola's testimony that it was "clear" from his conversation with petitioner on March 20, 2018 that DOI had become involved in the fraud investigation — thereby triggering respondent's internal fraud protocols requiring all contact with law enforcement to be arranged by DOI — supports the finding of misconduct under charge No. 2.
With regard to charge No. 3, after comparing petitioner's statements during the March 5, 2019 interview with the contradictory testimony elicited by respondent during the hearing, and taking into account the Hearing Officer's credibility determinations (see Matter of Snowden v Village of Monticello, 166 AD3d 1451, 1453 [2018]), we conclude that there is substantial evidence to support the finding that petitioner was untruthful during the interview. Charge No. 4 alleged that petitioner's actions between March 19 and March 22, 2018 were unethical and failed to adhere to the Comprehensive Audit Manual, which required respondent's employees to "conduct [their] work with the highest ethical and professional standards," ensuring that their professional behavior reflected positively on the agency, the state and the auditing profession. In light of the foregoing evidence, there is substantial evidence — that is, "a rational basis in the record as a whole"[*4]— to support the Hearing Officer's finding that petitioner failed to adhere to such requirements (Matter of Wales v City of Saratoga Springs, 200 AD3d at 1264 [internal quotation marks and citations omitted]). Accordingly, there is no basis upon which to disturb the misconduct findings against petitioner regarding the Croton-on-Hudson audit (see generally id.; Matter of Bruso v Clinton County, 139 AD3d 1169, 1172 [2016]).
The misconduct charges regarding the Lakeland audit largely concern petitioner's conduct involving a subordinate who was actively seeking employment with the Lakeland Central School District (hereinafter the school district) while simultaneously working on the audit. The charge document accused petitioner of, among other things, (1) failing to notify management of a potential threat to the Lakeland audit's independence, (2) improperly certifying the audit after being aware of the threat to its independence, (3) lying or being less than truthful with a superior regarding the matter, and (4) conducting herself in an unethical manner.
The hearing evidence revealed that petitioner's office conducted the Lakeland audit between May 2018 and November 2018. Petitioner was the general supervisor of the audit and Jose Guevara, one of her subordinates, served as the examiner-in-charge. Tammy Cosgrove, assistant superintendent for human resources at Lakeland, testified that Guevara applied to be treasurer of the school district in September 2018 and listed petitioner as a reference. Cosgrove explained that she called Guevara's references in October 2018, specifically spoke with petitioner, informed petitioner that Guevara was applying for the position of treasurer and petitioner gave him a "[v]ery positive" recommendation. Guevara was ultimately offered the job and began employment with Lakeland in mid-November 2018.
Respondent also elicited testimony from Diane Peters — Guevara's administrative supervisor — who explained that she learned that Guevara started working for Lakeland in late November 2018 or early December 2018 and immediately brought this information to petitioner's attention. James Obeng, another auditor in petitioner's office, also informed petitioner of such information, testifying that, in late November 2018, he was shown a printout from the school district's website depicting Guevara working there and told petitioner as much. According to Obeng, petitioner replied that it was "just a rumor," but, after he raised the issue on two subsequent occasions, she eventually admitted that she knew Guevara had accepted a position with Lakeland, explaining that Guevara was using vacation time so he could retain state health insurance benefits while starting his new job.
Cole Hickland, an audit director who was overseeing the Newburgh Regional Office during the relevant time frame, testified that he learned about the potential threat to the integrity of the audit on December 7, 2018 and called petitioner that day. During [*5]their conversation, petitioner informed Hickland that she had become aware of Guevara's new employment a day prior. The evidence further established that, notwithstanding Guevara's employment with Lakeland, petitioner signed a Quality Assurance Certification form pertaining to the Lakeland audit on December 7, 2018. Hickland testified that it was "[a]bsolutely not" appropriate for petitioner to sign the certification when she knew of a threat to the independence of the audit presented by Guevara's conflict of interest.
As to whether petitioner's conduct with respect to the Lakeland audit was unethical, the Comprehensive Audit Manual tasked all division staff with "maintaining independence so that opinions, findings, conclusions, judgments and recommendations . . . w[ould] be viewed as impartial by reasonable and informed third parties." Under the Comprehensive Audit Manual, threats to independence were defined as "circumstances that could impair independence," including "the threat that a financial or other interest will inappropriately influence an examiner's judgment or behavior." Moreover, the Comprehensive Audit Manual stated that, where it became apparent to an examiner during the course of an audit that a threat to independence had arisen that was "so significant that it c[ould not] be reduced or eliminated by the application of safeguards, the work unit management should replace the examiner with an examiner who is independent."
When petitioner was interviewed about the misconduct allegations regarding the Lakeland audit, she denied knowing that Guevara was interviewing for a position with Lakeland while simultaneously involved in the audit and did "not recall" serving as his reference. She also did not recall having any conversations with representatives of Lakeland regarding Guevara's application. Petitioner maintained that she promptly reported the matter to superiors when she first learned about Guevara's actions in December 2018.
Notwithstanding petitioner's testimony to the contrary, there was proof that petitioner knew that Guevara was seeking employment with Lakeland while simultaneously involved with the audit, served as a reference in that capacity, certified the audit despite such knowledge and misinformed a superior that she was unaware of Guevara's situation prior to December 2018. Such conduct can readily be viewed as unethical in violation of the Comprehensive Audit Manual's requirements and provides substantial evidence to support the misconduct findings pertaining to the Lakeland audit (see Matter of Wales v City of Saratoga Springs, 200 AD3d at 1264; Matter of Bruso v Clinton County, 139 AD3d at 1171-1172).
As for petitioner's procedural challenges, we are not persuaded by her assertions of bad faith and bias on the part of respondent. Although petitioner contends that respondent acted in bad faith in declining to call William Campbell — one of respondent's employees who supervised petitioner — as a witness [*6]at the hearing, she does not reveal any favorable testimony Campbell might have provided and fails to account for the fact that she herself called Campbell to testify as a witness. Petitioner's claim of bias on respondent's part is also unsupported (see Matter of Scott v New York State Racing & Wagering Bd., 44 AD3d 338, 339 [2007], lv denied 9 NY3d 817 [2007]; Matter of Scott v Workers' Compensation Bd. of State of N.Y., 275 AD2d 877, 878 [2000]) and we reject her assertion that the Hearing Officer placed undue weight on her failure to testify at the hearing in support of the ultimate determination.
As to the penalty of termination, we recognize that petitioner had nearly a 30-year career in respondent's employ and a positive personnel record. However, given petitioner's misconduct of concealing a conflict during the Lakeland audit, which called her judgment into serious question, and the insubordinate behavior exhibited during the Croton-on-Hudson audit, we cannot conclude that the penalty of termination was "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness" (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 233 [1974] [internal quotation marks and citation omitted]; see Matter of Scuderi-Hunter v County of Delaware, 202 AD3d at 1317). Accordingly, the determination is confirmed.
Clark, Pritzker, Ceresia and McShan, JJ., concur.
ADJUDGED that the determination is confirmed, without costs.

Footnotes

Footnote 1: Deyo confirmed that respondent's internal fraud protocols were distributed to staff in May 2014 and, as a person in a management position in the Newburgh Regional Office, petitioner was responsible for ensuring adherence thereto.